**JORDON, Plaintiff-Appellee, v. BROUWER, etc., et, Defendant-Appellant.**

Ohio Appeals, First District, Hamilton County.

No. 7139. Decided October 24, 1949.

Andrew O. Haefner, Paul J. Hengge, Cincinnati, for plaintiff-appellee.

Robert G. McIntosh, Cincinnati, for defendants-appellant.

## OPINION

**By ROSS, PJ.:**

This is an appeal on questions of law from a judgment of

the Municipal Court of Cincinnati, in favor of the plaintiff. Trial was to the court without the intervention of a jury.

A motion to dismiss the appeal for failure to file the briefs of appellant in time was overruled.

The action was instituted against John A. Brouwer, as an individual and partner in the Cascade Products Co., and Dwight Curley as an individual and partner in the Cascade Products Co., and the Atlas Distributing Company, successor to such Cascade Products Co. John W. Brouwer was dismissed by the court. Otherwise, judgment was rendered generally for plaintiff.

In the bill of particulars, it is alleged that Brouwer and Curley were partners doing business under the name of "Cascade Products," "selling and distributing through distributors what is known and hereinafter referred to as Cascade Anti-Freeze," that the Atlas Distributing Company is successor to Cascade Products, and assumed all indebtedness of such latter organization; that plaintiff purchased a quantity of such Anti-Freeze from an authorized distributor of Cascade Products, under an **express warranty** printed on the labels of cans containing the liquid; that such warranty consisted of a statement upon such labels: "Glycerine Base Anti-Freeze, Laboratory Tested and Approved" and "we immersed speciments of copper, iron, steel, rubber from a hose and synthetic rubber, in a solution made by diluting the anti-freeze compound submitted with an equal volume of tap water for ten days at 140° F. No corrosion or other change in condition was visible on any of the specimens at the end of the test."

In the bill of particulars it is further alleged plaintiff took precautions found in instructions for use of the liquid suggested by defendants on such labels and, "plaintiff further says that relying upon the express warranty that said Cascade Anti-Freeze solution was safe and harmless for use in the raditor of an automobile and but for which he would not have so purchased and used said Cascade Anti-Freeze solution, when on the contrary, and the truth be known, said Cascade Anti-Freeze solution was inherently dangerous and destructive to plaintiff's automobile, and a few days after the installation of the Cascade Anti-Freeze solution, plaintiff discovered that said Cascade Anti-Freeze solution was not as warranted; that it did cause corrosion, stoppage and damage to the interior of the motor, radiator, hose connections, etc."

The statement of defense was in effect a general denial.

The label on one of the cans was introduced in evidence and contained only the following statements:

"CASCADE
GLYCERIN BASE, ANTI-FREEZE
Laboratory Tested and Approved
Laboratory Report

SMITH EMERY COMPANY
Chemical Engineers and Chemists
 Los Angeles, Calif.

Freezing Point _____Minus 60° F
Initial Boiling Point _____210° F

'We immersed specimens of copper, iron, steel, rubber from hose, and synthetic rubber, in a solution made by diluting the anti-freeze compound submitted with an equal volume of tap water for ten days at 140° F.

'No corrosion or other change in condition was visible on any of the speciments at the end of the test.'

CASCADE PRODUCTS CO.
Cincinnati, Ohio

Licensed under patents of Nyla Manufacturing Co.

"A PERMANENT TYPE
ANTI-FREEZE

A chemical antifreeze compound which possesses the properties that have been declared essential for a safe antifreeze. Safe by actual road and laboratory tests when used as directed. Will not evaporate.

PREVENTS RUST.

Will mix readily with water but works best if cooling system contains only CASCADE

CONGEALING POINTS OF
CASCADE ANTI-FREEZE

| Hydrometer Readings | Safe to | Gallons Cascade | Gallons Water |
|---|---|---|---|
| 19-20 | Plus 1F | 1 Gal. | 2 Gals. |
| 14-16 | " 15F | ½ Gal. | 2 Gals. |
| 26-27 | Minus 60F | 2 Gals. | 2 Gals. |
| 32-32.6 | " 12F | 2 Gals. | 1 Gal. |

Clean and flush radiator and check all hose connections, head gaskets, heater connections, etc, for radiator full at all times. Replace evaporation with water and leakage with CASCADE.

CASCADE PRODUCTS CO.,
Cincinnati, Ohio."

From the evidence contained in the bill of exceptions, it appears that plaintiff purchased the liquid from the operator of a garage and filling station, who, before putting the liquid

in the radiator of plaintiff's automobile, thoroughly checked all connections, which would be exposed to the liquid.

After operating the car for two days, it ceased to run, and upon examination at a garage, it was found that the liquid placed in the radiator had found its way into the compartment in which the oil used to lubricate the motor is contained (crank case), and that only a "gray substance" remained therein, and that when water was placed in the radiator, it flowed through into the crank case, that the water pump was leaking, and "everything froze up on me."

Some repairs were made on the motor and plaintiff again drove the car "a couple of days" and "I blew a head gasket." Again, repairs were made on the motor, and the head was "planed down". According to plaintiff's statement: "It run all right for a day or two and I busted a piston, and they fixed it up, and in a few days I busted a head gasket, and it went on like that. They put in new pistons and bearings, and altogether I think they put seven gaskets on and planed the head down twice." Plaintiff further stated: "I went in the first of October and they said they couldn't do anything more with the motor. It was twisted and I sold it."

Plaintiff complained to Curley, who said: "If you have complaints, see us, we're protected by Lloyds of London."

Plaintiff had purchased the car in 1947, a used 1940 Plymouth, containing a new motor. Fresh oil was placed in the motor the day the fluid was put in the radiator. Plaintiff further stated that upon examination after use of the Anti-Freeze, the radiator was found to have "a million pin holes in it" and leaked when the motor ran. The hose connections were eaten away. A garage mechanic who worked upon the car after the anti-freeze solution was placed in the radiator testified:

"A. The antifreeze had taken something out of the metal and let the water and the anti-freeze solution seep through down to the pan diluting the oil, and that in turn seized the motor and caused all the trouble.

"Q. Now, your inspection and check on that and from your experience you found that the condition of the car was due to what?

"A. Due to the solution of the antifreeze that was in the car.

"Q. And it affected those parts how with reference to the metal?

"A. Well, it seemed to just eat the gaskets up and in that

way leave the solution go into the oil.

"Q. Would it eat into the metal.

Mr. McIntosh: Objection.

The Court: Sustained.

"Q. What did you find its effect on the metal to be?

"A. To the naked eye you couldn't see any effect on the metal, but I believe that something was taken out of the metal—some form of substance—iron or steel or something was taken out by the active solution that leaves the water seep through."

And, again:

"Q. What did you find with reference to the condition of the metal after the solution was in?

"A. Well, the block was distorted and the head was distorted in such a way that it would leave the water or solution through.

"Q. What did you find with reference to the oil in the crank case?

"A. Well, it was a gray muddy color.

"Q. Was there any oil present?

"A. What?

"Q. Was there any oil present?

"A. Very little.

"Q. What did you find with reference to the condition of the valves?

"A. The valves and stems were all seized to the valve guides.

"Q. Would they have the play that is customary in the valve?

"A. No.

"Q. What was their condition with reference to play?

"A. With reference to play?

"Q. Play. The ability to move.

"A. Well, they were sticking.

"Q. They were sticking. From your inspection and repair on the car, what parts were affected on the car?

"A. Well, the pistons, the rings, bearings, the cylinders, the valve guides, hoses, gaskets, the brass bushings that pin the ride on, and the radiator.

"Q. Now, did that car come in repeatedly over a period for repairs?

"A. Yes, sir."

The defendants called a chemist who stated he had tested certain solutions for the defendants, but there is no evidence that the **particular** solution **used by plaintiff** had been tested. On the other hand, the chemist stated that cans of the fluid were selected at random from that on sale by the defendants and that such tests showed it was safe for automotive use and that the defendants were so advised. Defendant Brouwer testified that before the right to manufacture was purchased from Nylon Manufacturing Co. the fluid was tested and found to be harmless for automotive use, that after purchase of rights each batch was tested for safety in such use and all such tests showed safety, and that defendant had used the fluid in his own car without harm to the motor.

This action is predicated solely upon the premise of a breach of an express contract or warranty.

There is no privity between the plaintiff and the defendants, and such privity is necessary to sustain an action based upon an express warranty. Sec. 306, "Sales", Vol. 46 Am. Jur., p. 487. The plaintiff is a sub-purchaser through a dealer, an operator of a filling station, who purchased from a distributor of the product, and this is an action for injury to plaintiff's chattel. As noted in this section, there are exceptions to the rule of privity, where injury results to the **person** of plaintiff.

Liability has been sustained under the modern rule, even where the injury is to property, where the action is predicated upon the negligence of the manufacturer, which is shown to be the proximate cause of injury to a sub-purchaser's chattel. Sec. 824, "Sales" Vol. 46 Am. Jur., p. 946; See 164 A. L. R. 593; Sec. 497, Torts, Negligence, Restatement of the Law; see, Sec. 395 Id. See, also, 1948 Restatement of the Law, Sec. 497, Torts, p. 763. See, also: **Sicard v. Roux Distributing Co., 133 Oh St, 291, at p. 293.**

The instant action is not based on negligence, and even if it were, no negligence is shown in the defendants.

It, therefore, appears that, although the plaintiff might have a cause of action, he stated none in this action, and proved no facts upon which recovery might be had against the defendants. Judgment reversed, and judgment must be here rendered for the defendants.

ROSS, PJ, & HILDEBRANT, J, concur in syllabus, opinion & judgment.

MATTHEWS, J. Dissenting:
In the bill of particulars is set forth that the defendant

expressly warranted that the anti-freeze "was safe and harmless for use in the radiator of an automobile and but for which he would not have so purchased and used said Cascade Anti-Freeze." The evidence proves the allegation, particularly in view of §8392 GC, which provides that any affirmation of fact made to induce the buyer to purchase and upon which he relies, is an express warranty.

The defendant knew that this anti-freeze would be used in the radiator of automobiles. That was the very purpose for which it was manufactured and used.

Had this action been instituted by the original buyer from the defendant, who had used it in his automobile, it is clear that he could have recovered the damage inflicted upon his automobile, resulting from the harmful nature of the substance. Such damage would be the loss directly and naturally resulting in the ordinary course and within the contemplation of the parties, which is the measure of damage ever since Hadley v. Baxendale, 9 Exch. 341, and now in statutory form is found in §8449 GC.

And when a vendor places such a representation and warranty on a label intended to be passed on until it reaches the ultimate consumer as he did in this case, he must be taken to have made the representation and warranty to the ultimate consumer, who would be the only person likely to suffer by reason of the falsity of the representation and the breach of the warranty. Placing such a warranty on the article sold brings the producer into jural relations with the ultimate consumer, because the producer so intends. It is a representation and a warranty made by the producer to the ultimate consumer and creates a privity between them.

For these reasons, I am of the opinion that the judgment should be affirmed.